I'm Hugh Hewitt with co-counsel Bill Halley. I also want to recognize him in the courtroom with his counsel for the City of San Diego. We are asking this court to vacate and return to the District Court with instructions to revise and clarify its permanent injunction. We are doing so so that in those revisions the court will remove the inhibition it has put on the City of San Diego to control its own land use process, that it will restore to my clients and other landowners the ability to use the Endangered Species Act as it was intended to be used, that it remove the myth that there is a HCP out there, Habitat Conservation Plan, out there that everyone must wait for even though it is not there and not coming, and that finally that 65B's standards be applied because if the court itself is confused, as it has indicated many times about the extent and breadth of its own order, we certainly are. Before I go into those four, I'd like to put the backdrop up there. When the San Diego Multiple Species Conservation Program was passed, it was implemented in 1997, everyone greeted it as an extraordinary achievement. Governor Pete Wilson, Secretary of the Interior Bruce Babbitt, scores of landowners, environmentalists, 12 different jurisdictions, said this was the biggest breakthrough in endangered species planning in the then 25-30 year history of the Endangered Species Act. It has since become something of a nightmare, and far from being a model to be pursued, a warning signal to everyone else, don't go there. And in fact, if this permanent junction remains in place, I believe it will work. You're not challenging the basic ruling that the plan didn't, for whatever reason, meet the environmental standards or the environmental laws? The basic ruling that seven species should not receive take under the ITP, no, we have not appealed that. So what you do have is you're not contesting that there can be an injunction against building relying on that permit? Absolutely not. In fact, we would like it to be revised so that it narrowly achieves the goal. Let me ask you, under the injunction now, can developers who had not applied to the city prior to the issuance of the injunction, are they free to go independently? It's unclear. We believe that they should be. The judge has indicated that they are on some occasions. I'm sure that plaintiffs' appellees will say that they are. However, in the post-injunction opportunities that we have had to bring matters before the court, we have been treated to a series of erratic conversations and rulings such that we are left in limbo as to what means pre-injunction and post-injunction. I want to make sure that I understand precisely what the problem here is. Your clients or the builders would like to be able to, while we have this interim discussions going on between the Fish and Wildlife Service and the county over the seven species whose habitat are the vernal pools, they would like to be able to go to the Fish and Wildlife Service independently to seek the ITP. Is that correct? Under the pre-existing ESA Section 10 permitting process. Very close, Judge. There are a couple things we'd like to do. We'd like to be able to plan our property through the ordinary course of the city. There's a lot of land with vernal pool habitat on it that does not have endangered species on it. And this permanent injunction forbids the planning of that. Secondly, we would like to be able to use Section 7 and Section 10A as existed prior to 1997, as exists anywhere in the United States, and which has been put away from all of the landowners in San Diego County with vernal pool habitat, whether or not they have endangered species on them. They have actually been cabined and put aside, and the judges suspended the ordinary operation of the endangered species, both Section 7 and Section 10A, for landowners who ought normally to be able to go there. The fact that vernal pool habitat is being regulated or cannot even be brought before the city in the ordinary permitting process brings up Arizona cattle growers. This court said only 10 years ago that whatever the Endangered Species Act intended to do, it did not intend to regulate and did not intend to criminalize the use of property that does not contain endangered species on it. Right now, under the permanent injunction, you may not bring your property. If you were before the city prior to the ruling of 40 months ago, you can't bring your property to that city and say to them, Under the court's order, the city may not touch that. Now, that surprised us. Indeed, it has often seemed to have surprised the judge himself in the conversations and oral arguments that we've had. He has apologized for the confusion that has arisen out of that. But that issue is one we can discuss, the difference between a vernal pool in general and a vernal pool that has some of these seven species. Yes. But Judge Bivey's question, I think, is different. That's a fairly narrow question. Judge Bivey was asking, I think, about the question of whether your clients want to go directly. Let's assume they're clients who have these species. They want to be able to go directly to get their own permit? Yes, they do in some instances. Currently, they cannot go to the city and come under the city's general permit, because those seven species are the subject of ongoing negotiations between the city and the Fish and Wildlife Service. They cannot go because the court has said they cannot go. The court believes there are ongoing negotiations. There are not, in my opinion. There is no HCP that is out there. There has been some funding, but it's not going to happen. And while I want to reserve some time to come back after appellees have made their case, I think it's very important to recognize this. The judge's Paragraph 3 says go back and work on this. Nothing has happened in 40 months. There is no HCP. There isn't going to be an HCP, in my humble opinion, because of the complexity. This is an HCP with respect just to those seven species? Correct, Judge. And so while we exist in this legal limbo, while my clients cannot use Section 7, cannot use Section 10A, the judge's order continues to invest this mythical, almost a Holy Grail-like HCP will arrive and will fix everything. It hasn't arrived. It's not going to arrive. Even if the city were to adopt one down the line, it would have to still clear the U.S. Fish and Wildlife Service. It would have to clear subsequent judicial proceedings. It would be years away. Meanwhile, our clients exist in limbo, unable to move forward with the ordinary process of the ESA. In effect, the district court has amended the Endangered Species Act. Is there anyone out there who may have those species in vernal pools on their property who is permitted to go to the FWS under Section 10? Not right now. You could bring your own Section 10A permit, but under the judge's ruling, the way that he's interpreted it and the colloquies that we've had. Whether you had a preexisting, whether you had an application pending with the city on the day that the injunction was issued or whether you just bought the property last week, you still cannot go to the FWS. As to the latter, there is some obscurity and some ambiguity, Judge Bivey, because it isn't really clear what that means, post-injunction, because sometimes people will put in an application for land 20 years ago for a rezoning or a comprehensive land-use change, and it languishes there and you show up and all of a sudden you're told, we can't do that, you've got vernal pool habitat. So your post-injunction, pre-injunction distinction makes sense in the law, but in practice, it isn't working. It's not a clear... Oh, you say even if the injunction says specifically you can't do it if you had an application pending, but you can if you didn't, that wouldn't be enough either? It's not clear enough. That's our 65D process. How would you make that clear? I would simply say, and we hope that the court directs the district court to say, that the incidental take permit is invalid as to those seven species. That's all. Because at that point, we are back where we were prior to 1997. And an applicant can come forward and use Section 7. They can urge the city to adopt an HCP, which the city may or may not do and to which they may or may not commit, or they can simply choose to sell their land. Critically, if they don't have vernal pool habitat on their property, they can develop in the ordinary course. Critically, the city can get the position, can bring this to the position where the agencies can even consider it. Before I sit down and wait to hear the rest of the argument, I do want to stress this. This most important program has been shattered as to these seven species, and it sends a message across the United States. Don't get involved in comprehensive species planning, or you will end up back and forth to the court trying to get a new process, never before seen, wholly invented, that amends the Endangered Species Act, and you're going to be guessing every single day. It will kill multiple species planning in the United States if we do not somehow get this permanent injunction back to what it meant to be, which is, and we do not appeal the finding of the judge, inappropriately granted an incidental take permit as to those seven species. They've been severed. No one can take those species without risking criminal prosecution unless they go to the U.S. Fish and Wildlife Service. So with that, I'll reserve the balance of my time. Is there any evidence in the record about whether all the vernal pools have these species or not? Yes, there is. There are, depending on whether you accept the record evidence of the U.S. Fish and Wildlife Service, about 828 acres of vernal pools. The city of San Diego says about 1,193 acres. The service says only 200 acres of those are occupied by one of the seven species, and I want to make sure the court understands these are not contiguous. Sometimes a vernal pool will be the size of this lectern. It will be a road rut, and it will infect, thus, 100 acres or 185 acres. One of the projects that we've had before the court, the Crescent Heights project, 185 acres, has 1.6 acres of vernal pool on it. It is not proposing to touch any of that vernal pool, and yet it remains enjoined by the court, even though the U.S. Fish and Wildlife Service, in a post-injunction proceeding, cleared it to proceed. That's the extent and breadth of the district court's order, and he has himself, in many occasions, and we have the transcripts before you in the motion to supplement the record, apologized for the confusion and evidenced that it's a very difficult, complex situation. It's not surprising. But here we are 40 months after the order was issued, and we don't have any progress. What we have is paralysis and a warning sign to the rest of the country, do not practice this sort of species planning. Okay, thank you. Good morning, and may it please the Court. My name is Daniel Roth, and I have the honor of representing the appellees in this case, the Center for Biological Diversity and other organizations working to protect the highly imperiled vernal pool ecosystems of the city of San Diego. In sum, this Court should affirm the injunction issued by the district court. The injunction's parameters were carefully and specifically delineated by Judge Brewster, who also expressly approved specific actions by the city to implement the injunction when he denied an earlier effort by the building industry to narrow the district court's injunction. The injunction is- May I just ask you, sir, I gather there's nobody here from the city? There is counsel for the city here observing the argument today, Your Honor. Okay, but there's nobody here to tell us what the city's position is, for example, and counsel's report that in his view there's nothing going on and nothing will be going on between the city or the county or whatever it is in the Fish and Wildlife Service to attempt to revive the permit that the city or county got. Your Honor, the only thing on paper which is up to date is that the U.S. Fish and Wildlife Service a few months ago gave a grant to the city of San Diego of well over half a million dollars to complete a new habitat conservation plan for vernal pool species. There has been no pronouncement from the city that it intends not to go forward with that process. So we submit, Your Honor, that the appellant's frustration should be directed not at this court, but at the city of San Diego. If the appellants would like the city of San Diego to pursue regulation of vernal pools in some other manner than the city has chosen to do since 1997 and has never revised that decision, then the appellants could go and ask the city, please do it some other way, because right now we are subject to an injunction. Why shouldn't the builders be able to go to the Fish and Wildlife Service for an ITP directly? Because, Your Honor, the appropriate injunction when the court found that this overall strategy for managing vernal pool species comprehensively in the city, which the city and the Fish and Wildlife Service jointly decided was the best way to approach vernal pool conservation, was unlawful. And so the appropriate remedy when that finding is made is to remand it back to those entities, which the district court did, and also to say we should maintain the status quo, maintain all of the options available to those parties in the meantime to devise an overall strategy that complies with the requirements of the Endangered Species Act. And as the district court found, allowing incremental case-by-case consultation would be inappropriate. It would actually foreclose alternatives for those two entities to consider on remand. Why would case-by-case consultation be a problem? If you're going to the Fish and Wildlife Service and asking them for a Section 10 permit, they're not going to use a standard different from what the city was going to do under the comprehensive permit. Yes, they actually would, Your Honor. As the district court noted, it said the district court found that by the time Fish and Wildlife Service undertakes incremental site-specific consultations, it may have lost the opportunity to protect vernal pool species from extinction. And so in an individual ---- I don't understand that. Pardon me? I don't understand that. Because when the Fish and Wildlife Service is looking in isolation at one particular project, it is only looking at whether that one project jeopardizes the continued existence of the entire species. However, when the Fish and Wildlife Service and the city are looking comprehensively at the entire range of these vernal pool species, as they are doing under the Habitat Conservation Plan, they can consider on an overall basis biologically what is best for the conservation and recovery of the species. Linkages, they can consider issues like linkages. They can consider issues like recovery of the species. What is required? What particular habitat is required for, biologically, for the continued existence and recovery of these species? I understand your argument. I think your argument makes a lot of sense, Counsel. But prior to San Diego's efforts with the Fish and Wildlife Service, the seriatim or case-by-case consultation is exactly what the Act would have required. That's one of the options under the Act, yes, Your Honor. There are a number of ways that a party ---- This looks like a very forward-thinking plan for San Diego to come up with a comprehensive plan. But in the meantime, it appears that everything is enjoined that has these seven species on it and that there isn't any current negotiations going on between the Fish and Wildlife Service and San Diego to do this. And now you've got builders who are saying, well, we have an Endangered Species Act. Why can't we use the remedy that Congress provided for us? Well, Your Honor, I would submit that there is simply no evidence in the record that there are no discussions going on between the Fish and Wildlife Service and the city. That's simply a representation counseled by the appellants. If there is any evidence in the record that there are negotiations going on, aside from the half-a-million-dollar grant that you described? Well, the grant is there, but the Fish and Wildlife Service, in fact, gave the city that grant to do what the city was ---- to do what the city has said that it intends to do since 1997, which is to regulate vernal pools on a comprehensive basis. And the Fish and Wildlife Service cannot make the city do that. The Fish and Wildlife Service cannot force the city to go more quickly through the process. The Fish and Wildlife Service has done everything it can to facilitate the city going through that process. Thirteen years seems like an awful long time to get a city to do something if they haven't submitted another plan yet. When was the last time the city said it's pursuing this? Your Honor, the district court's decision was not until 2006. Subsequent to that decision, all of the parties engaged in about a three-year-long process to try to negotiate an overall strategy that does, in fact, comply with the Endangered Species Act. Those discussions broke down only about one year ago when the appellants decided to pursue their appeal. However, actions subsequent to that have indicated that the city still and the Fish and Wildlife Service still intend for an overall comprehensive approach to be the vehicle for regulating vernal pool species in San Diego. Suppose a developer has 200 acres. There are some vernal pools on it, but there are no endangered species. Why shouldn't that person be able to go ahead and build? Well, there are several reasons, Your Honor. First of all, in most cases, it will not be clear whether or not the vernal pool species, in fact, inhabit the property. These species are very difficult to detect by their nature and their life cycle. And so there is a survey protocol to determine whether or not species, in fact, are present on the land. And so simply looking at that land very quickly, a landowner and even the Fish and Wildlife Service generally is unable to tell whether or not the species are present. Second of all, even assuming that the species were not to be present, the Endangered Species Act's ultimate goal is to recover listed species. And the district court in this case found that in looking at an overall conservation strategy, the Fish and Wildlife Service had to consider recovery of the listed species. And this particular ecosystem, over 97 percent of this ecosystem has been destroyed. And so extant vernal pool resources may well be crucial for the recovery of those species. If a landowner or a developer wants to build on property and it has a vernal pool, does he automatically have to get a permit or only if there are endangered species in that vernal pool? And if he doesn't know, how does he know whether he has to get a permit? There are two sets of regulations that the party has to comply with. One, state and federal ordinances dealing with wetlands. And second, the Endangered Species Act under Section 9. Under Section 9, a party only is precluded from having an effect on listed species to the extent that it results in the actual death or injury to those species. And so that can be, sometimes that can be unclear to the parties, but the city of San Diego has chosen to deal with comprehensive regulation of species through the habitat conservation plan. I forget, suppose there were no San Diego plan of any kind, valid, invalid, being negotiated. A developer says, I'd like to build on my property. And he says, well, I've got some vernal pools, but I don't think they've got any of these little fish or plants or whatever. Can he just go ahead and develop or does he have to get a permit? The city of San Diego, for land with vernal pool resources, requires developers to show that they have satisfied the requirements of the Endangered Species Act. So apart from if we assume the multiple species conservation plan did not exist, what a developer would have to come forward with is either some sort of indication that there were no threatened or endangered species on the property, or the developer would have to come forward with an indication that the Fish and Wildlife Service believed that there would be no Section 9 violation as a result of the proposed development. Now, under the injunction, could this developer go ahead or because there are vernal pools on it, he is precluded? Under the current injunction, Your Honor, a developer would be precluded from going through the approval process for property that has vernal pool resources on that. In addition to the biological requirements to protect these species and therefore keep all the options open for constructing a legal, lawful overall plan, one of the important elements for a lawful habitat conservation plan is that the city has to ensure funding for that plan. The district court in this case found that this particular plan did not assure funding and the city of San Diego had merely presented a wish list of potential funding opportunities. One funding opportunity for this sort of overall conservation strategy is that other cities have employed. For example, there was a case cited by the district court in its opinion here involving the Natomas Habitat Conservation Plan to the north in Sacramento, where the city of Sacramento relied on a per acre development charge for all property owners that had a particular resource, endangered species habitat, on their property. And those developers had to pay a per acre development charge to the city and the city used that funding to fund its overall conservation strategy. In this case, Your Honor, the injunction is very important because if developers were allowed to go through the approval process and the city were to grant all of the approvals, what the city would be giving up is an opportunity to levy such a funding requirement against developers, which would go to fund an overall conservation strategy and thus produce a lawful habitat conservation plan under the Endangered Species Act. But the city didn't care for argument time to defend its actions here. That's correct, Your Honor. There's no allegation that what the city is doing is unlawful in a manner that the city is not currently attempting to remedy. I have to say I find it just a little odd that we don't have the benefit of the city arguing today because it might be helpful for us to know how the city viewed this lawsuit and whether it thought it was going to interfere with its overall plan. Well, I think, Your Honor, in a sense the city holds the keys to its future in its own hands. If the city decides to inform the district court, the U.S. Fish and Wildlife Service, and this court that it wishes to pursue some other course of action for regulating vernal pool species, the city is certainly free to take that action. And I think the only presumption that this court can take from the fact that the city has not done so, which it easily could do, is the fact that the city is actively, with the Fish and Wildlife Service, is actively engaged on the remand in this case from the district court, which is to go forward and formulate a lawful habitat conservation plan. We don't know, for example, whether the city would object to clarification of the injunction and whether the city would object to builders going directly to the Fish and Wildlife Service under Section 10. Well, Your Honor, I think that's inconsistent with the Endangered Species Act. Inconsistent with the Endangered Species Act for people to go to the Fish and Wildlife Service under Section 10? Yes, it would, Your Honor. That is the Endangered Species Act. How could it be inconsistent with the Act? Because Section 7D of the Endangered Species Act forecloses any actions which could foreclose reasonable and prudent alternatives for, in this case, for a comprehensive plan. So, for example, if a party went through a separate Section 7 consultation on a site-specific matter and eventually developed that area, that would, of course, foreclose both funding opportunities for the overall management plan and it would foreclose the overall management plan from saying, this area is an important area for preservation or connectivity or whatever. If they went for a permit from the Fish and Wildlife, they could say no, no permit because it's going to foreclose other opportunities. The Fish and Wildlife Service, Your Honor, would have to do so. Yes. So they wouldn't give an individual permit if they thought it would foreclose the kind of opportunity you're discussing to have an overall plan. Well, Your Honor, this case is actually very similar to a case that you authored called the Pacific Rivers Council v. Thomas. In that case, there was an overall plan, which was a plan by the U.S., a forest plan, for governing the management of a national forest. And this Court found that when reinitiation of consultation on that overall plan was taking place, that interim site-specific development actions like building roads or doing timber sales were per se violations of Section 7D. And the facts of this case are very, very similar in that while the City of San Diego and the Fish and Wildlife Service are engaged in reinitiating consultation on this overall management strategy, that allowing individual developments to go forward and impact vernal pool resources and preclude funding opportunities, those would be per se violations of Section 7D unless, of course, the City of San Diego were to change its mind and decide not to pursue an overall strategy. One thing, factual matter, that is unclear to me is whether vernal pools that have no endangered species in them, if because the pools sort of appear and disappear, if it's likely that there could ever be the endangered species in them if they're not already in them. Your Honor, I mean, that's a biological question. But, in fact, there are biological means that these particular vernal pool plants or fairy shrimp species can expand their range, or potentially the Fish and Wildlife Service or the City of San Diego could pursue methods on their own to transfer these species to other habitats. I thought you had talked about recovery before, that they could protect the vernal pools without these endangered species because of recovery. No, Your Honor. The recovery requirement is an important requirement of the Endangered Species Act. And the district court found, appropriately, that the Endangered Species Act, and particularly Section 10, was concerned not just with the existence and avoiding jeopardy to these particular species, but also promoting their recovery. And so the district court charged the Fish and Wildlife Service with considering the recovery plan. How would they propose to recover? The recovery plan calls for protecting virtually all remaining vernal pool habitat in the City of San Diego. So you would plant some of the endangered species in the vernal pools that don't have them? Well, first of all, Your Honor, it would be conserving the existing vernal pools that are occupied. But what about the ones that aren't occupied, Judge Harkins is asking? The ones that are not occupied, Your Honor, those are potential habitat resources that could be used to transfer endangered species into those existing vernal pools. This is actually something that the U.S. Fish and Wildlife Service and the City are actively engaged in right now. There was a vernal pool on an airport near a radar facility, and the parties came to the district court and said, we'd like to fill this vernal pool and came to the plaintiffs and said, we'd like to fill this vernal pool because it's causing a public safety hazard. We agreed with the City that that had to take place, notwithstanding the injunction. So the district court has been very actively involved in administering this injunction. And the parties went forward, filled that vernal pool to provide for public safety. They went in and took out the soil and the cysts of the fairy shrimp, and they are attempting to restore those creatures to a nearby remnant vernal pool. And those sorts of actions would be things that they could take on recovery, actions that they could take on recovery. In sum, Your Honors, we feel that this particular decision by the district court does stand for an important proposition nationwide, which is simply this. If you pursue an overall conservation strategy, it's a very good idea. You simply must do so lawfully. So we urge this Court to uphold the scope of the district court's injunction. Thank you. Roberts. Thank you, counsel. I'd like to cover three things, which is Judge Hugg's question about permitting. Judge Bivey's emphasis on Section 10 to the exclusion of Section 7, and Judge Reinhart's opinion in Pacific Rivers Council. Judge, when you said, does that mean they can't build on the vernal pools that are non-occupied, not only can we not build on them, we can't process paper before the city. The process is extraordinarily complicated now. You've got to go through any number of grading permitting processes, soils analysis, different regulatory agencies. All of that is closed, forbidden, shuttered. Well, that's kind of a separate issue, which doesn't go to the core of this. I mean, you could easily say, okay, go ahead and satisfy any other aspects of the plan and then worry about the Section 7 or 10 permit or whatever you need later. But to me, at least, that doesn't seem to deal with the basic issue. Judge, if I could, that's what the city asked for and the district court said no. They asked for that. That's a separate issue. It goes to the abuse of discretion in the injunction. Pardon me? It goes to the abuse of discretion in the breadth of the injunction. In one way, would you be satisfied if we just said, okay, let's have the city process, but don't let them give any actual permit? It would be a vast improvement. However, I still believe the suspension of the Endangered Species Act is wrong. And not just Section 10A, Judge Bivey, but Section 7 is routinely used by landowners across the United States in concert with federal agencies from coast to coast and north to south. It's gone on for 37 years, and it works. It works everywhere. This is the only place, because plaintiffs have skillfully persuaded the district court to suspend the ESA and to mandate regional planning, and not only regional planning, one sort of regional planning. If we had no injunction, and we've never had an injunction, somebody has a developer has a piece of property with three vernal pools on it, and he looks at the pools and says, I don't see any species there. What does he have to do to get a permit? It would have, under the old 1997 ITP that took five years to develop, it would have depended upon whether they were in or outside. Are you talking before the MSCP, Judge? I'm saying without regard to the city's plan. Oh, they would have been obliged to, if it had endangered species in it, to either. No, no, they look at these vernal pools and say, my vernal pools don't have endangered species. If they were wrong, they'd go to jail, and if they were right, they could develop. However, I want to point out that the court has said, the district court has said, as to your question about That response is a puzzle to me, about going to jail. Here is a person is applying to be able to construct on this acreage. There are no endangered species in that area, in any of those vernal pools. So normally, if there weren't an injunction, make an application to the Fish and Wildlife Service, right? If there were no endangered species, they wouldn't have to, Your Honor. That's what I was referring to when Judge Reinhart asked me. If there were species there and you took them, that's the criminal penalty. If they're not there and you're correct about them not being there, you may develop the property consistent with other Federal errant laws. If you want to be doubly sure and not go to jail, you'd ask the Fish and Wildlife Service to confirm the facts. They won't often confirm, but you might process anyway. And that's why my client spent five years, committed to more than $100 million, 60,000 acres, to develop a multiple species program that was comprehensive and groundbreaking, because they wanted certainty. The reason you enter into this is not that it's a trap. It's turned into a trap. It's turned into quicksand. But because you want certainty as to where you can build and cannot build. We are always and have been willing to be very comprehensive in our planning and our commitments to the ecosystem. But this isn't about that now. Now it's about being locked up, and plaintiffs love this. We're in limbo. Nothing is happening. Nothing is being taken. And, indeed, habitat that does not support any endangered species is put on a shelf. I do have to make sure I point out, by the way, Section 70 has nothing to do with this. Section 70, this is a 10A permit, and it's doubtful that Section 70 even applies. If it applies, it only applies because at the end of a Section 10A process, the U.S. Fish and Wildlife Service conducts a little dialectic with itself called the internal Section 7 consultation. It is arguable that 7D doesn't apply and that the internal Section 7 consultation isn't even required. But if it was, it would not be irretrievable for the city to do planning or the U.S. Fish and Wildlife Service to conduct this because you can't steamroll yourself. All that 7D was intended to do was to stop federal agencies from pushing the project so far down the road that the Section 7 would never catch up with it. And so that was never part of the district court's reasoning. It never came up in any of the papers. When it was originally introduced by counsel in one of our oral hearings after the injunction was entered, it was only obliquely brought up and quickly retreated from. And Pacific Rivers Counsel, I must respectfully disagree with my colleague, does not say what he said it said. Judge, when you wrote about it, you were very specific that you were talking about per se things like the extraction of timber, the construction of roads, not paper pushing that in no way affects the physical environment. I conclude by asking Judge Bybee, Section 7 matters a lot to us, as does Section 10. But what we would really like is to be returned to the status quo ante, not to be hung out here forever on the MSCP waiting for this multiple species plan. We hope it comes. We do not represent that it will not come. We don't represent that the city isn't interested in it coming. We tried for two years, as counsel said, in the complex mediation offered up by this court to reach a conclusion. So, counsel, you mentioned something in your opening speech about what it is that you would like the court to say. If we were to agree with you, what is it that we have to do? Revise the, vacate the injunction and return with instructions that say, mandate that the incidental take permit for the vernal pool species is invalid and may not be used to support incidental take, and state that anyone seeking to impact, in any way, harm, harass, or otherwise, take vernal pool species of the seven, use the appropriate methods of the Endangered Species Act, including, not limited to, Section 10A or Section 7. And that's it. Because it seems to us... It would include an overall resolution of the problem. It would put us back to where we might, again, be able to pursue a habitat conservation plan, because, in my opinion, Your Honor... How could you pursue a plan if individuals are getting permits in various places? Then how could you have an overall plan? They can proceed at pace at the same time, often have, always do in other situations. And what has happened here is that plaintiffs and other groups have no incentive, really, to engage in serious negotiation because there is no development going on whatsoever. Well, the city must want development. And the city, it's good for the city to have development. They get money from it. And cities need money from anywhere. And so I don't really understand why you say the negotiations broke down. But what it takes is the city and the Fish and Wildlife Service to resume this process and resolve it. What's preventing that? It takes a lot more than that, Your Honor. It takes the landowners to come to the table as well. It takes every environmental group to agree at the end. Remember, we had many environmental groups agree on the original HCP. Some stayed back 18 months after it entered in. They sued under the Endangered Species Act. That was their right. They didn't like the way that it worked. The problem with the HCP is that it takes forever. It goes from a concept. Then it has to go to the city council to be approved if the landowners and the environmentalists have agreed to it. Then it goes to the U.S. Fish and Wildlife Service to conduct its consultation on. Then it goes to the public to be able to bring a lawsuit. And that's what happened. This began in 1992, not 1997. It took five years to get to 1997. A year and a half after that, the lawsuit was brought. Four years after that, the judgment was entered, which was 40 months after the oral argument in the case. And four years after the judgment was entered, we're still trying to figure out what the order means. It is a giant beacon to the world, don't do this, which is very unfortunate. It's a very unfortunate situation that any lawyer like me who advises landowners has to say to them, comprehensive planning has become a swamp in San Diego. Be forewarned that you might end up going back and forth to a federal judge. And we put the transcripts in there who, because of the complexity of it, often finds himself admitting to being confused and apologizing for it. It's a very difficult situation for everyone concerned. Thank you. Thank you. This argument will be submitted.
judges: Hug, Reinhardt, Bybee